IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 3, 2024 Session

## STATE OF TENNESSEE v. MICHAEL M. COOK

**Appeal from the Criminal Court for Shelby County
No. 18-06608, C1810029   Paula L. Skahan, Judge**

_____

## No. W2022-01534-CCA-R3-CD
_____

The defendant, Michael M. Cook, was convicted of one count of aggravated rape and two counts of aggravated kidnapping for which he received an effective term of twenty-five years' incarceration.  On appeal, the defendant argues that: (1) police contamination of the condom that yielded the defendant's DNA profile resulted in a fundamentally unfair trial under *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999); (2) the trial court erred in not requiring chain of custody after the police mispackaged the condom in a way that degrades DNA; (3) the identification of the defendant's voice based on his testimony at the *Momon* hearing resulted in a fundamentally unfair trial; (4) the prosecution commented on the defendant's silence by arguing the defendant's rights prevented a non-suggestive voice identification; (5) improper argument by the State throughout trial affected the verdict; (6) the trial court failed to give a full and complete charge of the law by not instructing the jury on identification and other instructions requested by the defendant; and (7) the cumulative errors in the case warrant reversal.  Following a thorough review of the record, the briefs, and oral arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

Phyllis Aluko, District Public Defender, William Howell (at trial and on appeal) and Glover Wright (at trial), Assistant District Public Defenders, for the appellant, Michael M. Cook.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Devon M. Dennis and Gavin Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## *Facts and Procedural History*

The defendant was indicted for aggravated rape, two alternate counts of aggravated kidnapping, and theft of property over $10,000. The State's proof at trial showed that the victim returned home around 6:00 a.m. on August 20, 2017 and, as she was exiting her vehicle, a man wearing a black long-sleeve shirt, black jeans, black shoes, black ski mask, and black gloves approached her. The man held a gun to the victim, directed her behind a vacant house, and told the victim that he had been watching her. As the man kept the gun aimed at the victim, he told the victim to undress and forced the victim to perform oral sex on him. The man then made the victim put a condom on him and penetrated her vaginally. Afterwards, the man had the victim remove the used condom, which he placed in his pants pocket, and told the victim to get down on the ground and count to 200. The man told the victim that he would shoot her if she stopped counting or opened her eyes. The man then left and came back with a bottle of antifreeze, poured it on the ground around the victim where the sex act occurred and then left the vicinity. The victim did not know her attacker but was able to provide a description of the man's height and build and that he had dreadlocks with brown tips.

Later that morning, an unrelated party, Elizabeth Hall, reported that her vehicle, a Camaro, had been stolen. Officers located the stolen vehicle and, during an inventory, discovered items indicating the vehicle had been used in a crime, including items of black clothing and a black ski mask. The license plate on Ms. Hall's car had also been switched to the license plate for another Camaro – one belonging to Ja'Don Boyd. Officers believed it unlikely that Mr. Boyd was a serious suspect, thinking a perpetrator would not put his own license plate on a stolen car and also because Mr. Boyd's dreadlocks were different than the victim's description of her attacker's dreadlocks.

During the processing of Ms. Hall's stolen Camaro, a used condom was also discovered. Through the body camera footage of the police officer who processed the vehicle's contents and questioning by the State and defense, it was brought out that the officer wore the same pair of gloves throughout and touched approximately 240 objects and surfaces before collecting the condom. Photographs were entered into evidence showing the officer's dingy gloves and specks of some particulate on the condom.

The condom was sent to the Tennessee Bureau of Investigation ("TBI") for testing and ultimately revealed the presence of DNA consistent with both the defendant and the sexual assault victim. At trial, there was inconsistent testimony from the State's expert witnesses and the defendant's expert witness regarding the DNA evidence. It was also

brought out that at some point, the manila envelope in which the condom had been properly packaged had been placed in a plastic bag, which can be known to degrade DNA evidence.

Agent Kristyn Meyers with TBI testified that she located the DNA of a major female contributor on the inside and outside of the condom and the profile matched the victim. Agent Meyers was also able to locate a major male contributor on sperm fractions both inside and outside of the condom and concluded that the defendant's DNA profile was consistent with the major contributor for both the inside and outside sperm fractions. Agent Meyers determined there were "at least two" contributors to the sperm fraction on both the inside and outside of the condom, but she was unable to make any comparisons to the minor contributor. Based on her training and experience, Agent Meyers believed the male DNA in the sperm fraction came from a body fluid and not skin cells.

Samantha Spencer, the defendant's expert witness and former TBI analyst, called into question several areas of Ms. Meyers' analysis and determinations. Of particular note, Ms. Spencer thought it was more accurate to describe some of the DNA profiles as "including three contributors" because there was an unknown person's DNA on the condom, rather than including "at least two contributors." Ms. Spencer, however, agreed that the victim's and defendant's DNA were present on the inside and outside of the condom and that the defendant was the major contributor of the sperm fraction, but she asserted that it was impossible to know whether the defendant's DNA came from his semen or skin.

In rebuttal, Agent Lawrence James, a supervisor with the TBI crime laboratory, addressed Ms. Spencer's complaints in Agent Meyers' analysis and ultimately agreed with Agent Meyers' determinations. Agent James agreed there was DNA on the inside and outside of the condom belonging to the victim and a sperm fraction where the defendant was the major contributor. Based on his twenty-plus years' experience with the TBI, Agent James believed the profile from the sperm fraction came from sperm and not something else as Ms. Spencer suggested.

Also, during rebuttal, the victim testified that she was present for the remainder of the trial, including during a jury-out hearing when the defendant spoke aloud for the first time. The victim said that when she heard the defendant's voice, the day of the offense "flooded back" to her and her brain replayed hearing the defendant tell her that she should be thanking God for sparing her while he raped her. She stated that her rapist's voice had replayed in her head nonstop for five years and after hearing the defendant's voice, she knew he was the man who raped her.

Following the conclusion of the proof, the jury convicted the defendant of aggravated rape and two counts of aggravated kidnapping and acquitted the defendant on the theft charge.

*Analysis*

On appeal, the defendant argues that: (1) police contamination of the condom that yielded the defendant's DNA profile resulted in a fundamentally unfair trial under *Ferguson*; (2) the trial court erred in not requiring chain of custody after the police mispackaged the condom in a way that degrades DNA; (3) the identification of the defendant's voice based on his testimony at the *Momon* hearing resulted in a fundamentally unfair trial; (4) the prosecution commented on the defendant's silence by arguing the defendant's rights prevented a non-suggestive voice identification; (5) improper argument by the State throughout trial affected the verdict; (6) the trial court failed to give a full and complete charge of the law by not instructing the jury on identification and other instructions requested by the defendant; and (7) the cumulative errors in the case necessitate reversal. The State responds that this Court is limited to reviewing the defendant's claims for plain error because the defendant failed to file a timely motion for new trial and that the defendant has not established his entitlement to plain error relief on any of his claims. As we will explain, we agree with the State regarding the untimeliness of the defendant's motion for new trial, and then we will assess each of the defendant's claims for plain error.

The record indicates that following the sentencing hearing on August 11, 2022, the trial court clerk file stamped all four judgments (the rape count, the kidnapping count that merged, the lead kidnapping count, and the theft count of which the defendant was acquitted) that same day. The defendant did not file a motion for new trial within thirty days. Rather, on October 31, 2022, the defendant filed an untimely notice of appeal in this Court in which he acknowledged the untimeliness of his notice and asked this Court to waive the timely filing requirement. On November 4, 2022, this Court granted the defendant's motion to late file a notice of appeal and accepted the defendant's notice of appeal as timely. Also, on November 4, 2022, defense counsel informed the trial court that he had failed to file a timely motion for new trial and that he had filed a motion to late file a notice of appeal with this Court. After discussion, the trial court set a date for the defendant to argue a motion to late file a motion for new trial.

On November 18, 2022, the trial court entered an order finding that it retained jurisdiction to entertain a motion for new trial and directed "the entry of the judgments of conviction" to reflect the date of November 18, 2022. The trial court noted that, although it had orally pronounced the defendant's sentence in Count Two (the kidnapping count that was merged into the lead kidnapping count in Count Three) on August 11, 2022 and the

- 4 -

clerk file-stamped the judgment the same day, the court had not actually entered a sentence in that count because it failed to sign the judgment sheet. The court determined that the judgment documents and its oral pronouncement on August 11, 2022, did not constitute the "entry of the order of sentence for purposes of [Tennessee Rule of Criminal Procedure] 33." Later that day, the defendant filed a motion for new trial and then filed an amended motion for new trial on December 12, 2022. The trial court conducted a hearing on the motion for new trial on December 12, 2022, and, thereafter, entered an order denying the motion.

A motion for new trial must be filed within thirty days of the date the order of sentence is entered. Tenn. R. Crim. P. 33(b). Tennessee courts have repeatedly held that the date the judgment was filed by the court clerk controls in determining the date on which a judgment was "entered." *See State v. Stephens*, 264 S.W.3d 719, 727 (Tenn. Crim. App. 2007) (determining that the effective date for entry of a judgment or order of sentence is the date of its filing with the court clerk and the "file-stamp" date provides evidence of when the order of sentence was entered by the clerk), *abrogated on other grounds as recognized in State v. Beaty*, No. M2016-00130-CCA-R3-CD, 2016 WL 3752968, at *20 (Tenn. Crim. App. July 8, 2018); *State v. Kimble*, No. W2012-00407-CCA-R3-CD, 2013 WL 3795949, at *4 (Tenn. Crim. App. July 22, 2013) (reviewing authorities and noting that "only a 'file-stamp' or other similarly designated marking by the trial court clerk can suffice to show what date the judgment was filed"); *State v. Norman*, No. W2003-02067-CCA-R3-CD, 2004 WL 2255253, at *5 (Tenn. Crim. App. Oct. 7, 2004) (determining that the judgment was entered on the date it was filed with the trial court clerk for purposes of assessing the timeliness of a notice of appeal), *perm. app. denied* (Tenn. Mar. 7, 2005); *cf. Graham v. State*, 90 S.W.3d 687, 689 (Tenn. 2002) (addressing the timeliness of an application to appeal the denial of a motion to reopen a post-conviction petition and determining that the day the judgment was filed by the clerk, and not the day the judgment was signed by the trial judge, was the day the judgment was entered and thus when the time commenced to run for filing an application to appeal).

In light of the aforementioned precedents, we determine that the judgments in this case were entered on August 11, 2022, the date they were file stamped by the court clerk, and the trial court's actions on November 18 and December 12, 2022, were nullities. "A court may not create jurisdiction over a matter where none exists." *Welch v. State*, No. W2008-01179-CCA-R3-PC, 2009 WL 1741394, at *2 (Tenn. Crim. App. June 15, 2009). As additional evidence of the trial court's "entry" of judgments on August 11, 2022, we observe that the trial court signed all three of the lead judgments in the case, the only one she neglected to sign was the kidnapping count that merged into the lead kidnapping count. Moreover, "[w]hen an appeal is filed, the trial court loses jurisdiction, and the jurisdiction of the Court of Criminal Appeals attaches." *State v. Peele*, 58 S.W.3d 701, 705 (Tenn. 2001). As noted, the defendant filed a motion to late-file a notice of appeal, which this

Court granted on November 4, 2022, so the jurisdiction of this Court had already attached when the trial court issued its subsequent rulings.

Because the defendant's motion for new trial was untimely, review of the defendant's allegations is only for plain error. We may consider an issue to be plain error when all five of the following factors are met: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). "[A]ll five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. "Moreover, the error must have been of 'sufficient magnitude that it probably changed the outcome of the trial.'" *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020) (quoting *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008)).

## I. *Ferguson* Issue / Contamination of Evidence

Prior to trial, the defendant filed a motion to dismiss alleging that the State violated *Ferguson* by failing to preserve DNA evidence found on the condom that ultimately linked him to the crime. In his motion and at a hearing on the motion, the defendant pointed out that body camera footage from the officer who found the condom showed that the officer did not change his gloves before collecting the condom, which created the possibility of unwanted genetic material being transferred to it. The defendant contended that the "contamination destroyed any potential exculpatory value possessed by the condom" because had it been properly preserved, the condom could have provided definitive proof that it was used, or was not used, during physical contact between him and the victim. He asserted that mishandling of the evidence by the police gave rise to a third possibility – that his DNA appeared on the condom when the police transferred it from a different surface. The defendant informed the court that his expert had concluded that there was a third DNA profile on the condom in addition to his and the victim's. The State responded that its expert was unable to definitively say a third profile was present. The trial court denied the motion to dismiss, determining that it was a question for the jury to decide the weight of the contaminated DNA evidence against the defendant.

On appeal, the defendant asserts that the denial of his *Ferguson* motion was in error because the State had a duty to preserve potentially exculpatory DNA evidence. In *Ferguson*, 2 S.W.3d 912 (Tenn. 1999) our supreme court held that the loss or destruction

of potentially exculpatory evidence may violate a defendant's right to a fair trial. *Id.* at 915-16. The court adopted "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013). The court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

When applying this balancing test, the trial court must first decide whether the State had a duty to preserve the evidence. *Merriman*, 410 S.W.3d at 785. Only constitutionally material evidence must be preserved, and to be constitutionally material, the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). If the State did have a duty to preserve the evidence, and breached that duty, the trial court must next determine whether a trial without the evidence would be fundamentally fair. *Ferguson*, 2 S.W.3d at 917. When doing so, the trial court must apply these three factors to the case:

(1) The degree of negligence involved;
(2) The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
(3) The sufficiency of the other evidence used at trial to support the conviction.

*Id.* We review the trial court's decision regarding the fundamental fairness of the trial under a de novo standard. *Merriman*, 410 S.W.3d at 790.

We determine that the defendant is not entitled to plain error relief because he cannot show the breach of a clear and unequivocal rule of law. *Ferguson* applies to the State's loss or destruction of evidence alleged to have been exculpatory. *Ferguson*, 2 S.W.3d at 915. The evidence in this case, i.e., the condom, was preserved and available for testing. The defendant's claim is that of possible contamination, which would appear to go to the weight of the evidence. Our research has revealed no clear and unequivocal rule of law providing that contamination of evidence is the same as loss or destruction for purposes of *Ferguson*. The defendant is not entitled to plain error relief on this issue.

## II. Chain of Custody

The defendant objected to introduction of the condom at trial on chain of custody grounds, asserting the condom was packaged in a way that could potentially degrade DNA evidence and that the chain of custody rule "is not . . . only about physically showing who held what[] but also goes to whether there was some sort of degradation of the evidence to

contamination." The trial court overruled the defense objection and, on appeal, the defendant argues that the trial court acted unreasonably in not requiring the State to establish chain of custody for the condom when it was "not show[n] that the condom arrived for testing uncontaminated . . . and did not establish when police improperly stored it" in a way that could degrade genetic material.

Rule 901(a) requires evidence be authenticated or identified as a condition precedent to its admissibility. Tenn. R. Evid. 901(a). "[A] witness must be able to identify the evidence or establish an unbroken chain of custody," but absolute certainty is not required. *State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000) (internal citation omitted). The purpose of this requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). The trial court needs only reasonable assurance of the identity and integrity of the sample in order to admit it into evidence. *Ritter v. State*, 462 S.W.2d 247, 250 (Tenn. 1970).

As to this allegation, we determine that consideration of the issue is not necessary to do substantial justice. In our view, the fact the condom was at some point mispackaged in a way that could degrade DNA material did not impact the outcome of the case. Agent Meyers testified that she did not observe any significant degradation in either the sperm fraction or non-sperm fraction profiles and also that a DNA profile would not change as it degraded, there would just be less information or it would go away entirely. The jury presumably convicted the defendant based on the presence of his DNA on the condom, something that degradation or possible degradation did not affect. Simply put, the DNA on the condom did not "degrade" from another person's DNA into the defendant's DNA.

In addition, as to the condition of the condom when the police officer collected it and turned it in to the property room, the jury heard that the officer wore the same pair of gloves while handling fingerprinting powder and collecting evidence, and saw photos and body camera footage of the officer's gloves being discolored and him holding the condom. The officer placed the condom in a manila envelope that he marked with his name and IBM number and delivered to the property room. The jury later heard that when Agent Meyers' received the condom, it was packaged in a manila envelope, that had been placed inside a plastic bag, that had been placed in another manila envelope. The jury saw photos of the condom when in Agent Meyers' possession showing the condom with black specks reminiscent of fingerprinting powder. The evidence indicates that the condom came to have black specks on it during the police officer's packaging of the condom into a manila envelope and that the manila envelope was at some point later placed into another package. There is simply no proof the condom itself was tampered with in between the time the police officer took it to the property room and the time it arrived at the TBI. The defendant is not entitled to plain error relief on this issue.

## III. In-Court Voice Identification

The defendant filed a pretrial motion to preclude the victim from making an in-court identification of him because the victim had not identified him outside of court, meaning any in-court identification of him would be the equivalent of a show-up. In the alternative, the defendant asked that the court require the State to conduct a "constitutionally adequate" out-of-court identification procedure prior to any in-court identification and to prohibit in-court identifications by any witnesses unable to identify him during that procedure. The court stated that it would conduct a jury-out hearing to see if the victim could make an identification.

Later, at trial but before voir dire, the parties questioned the victim outside of the defendant's presence regarding her ability to identify the perpetrator. The victim testified that she did not think she would be able to identify the perpetrator because he wore a ski mask. However, the victim agreed that she was able to provide the police with the perpetrator's height, weight, and complexion. The court observed that it was clear the victim could not make an identification but that it would consider the issue again if something changed at trial.

After the prosecution rested its case, the defendant took the stand for a *Momon* hearing to discuss his right to testify. The colloquy was as follows:

Q. Hello, [the defendant].
A. Hello.
Q. So, [the defendant], we -- we have met several times and we have discussed a number of your -- your trial rights.
A. Right.
Q. And we've talked about specifically your right to testify?
A. Right.
Q. And have I explained to you that that's your decision?
A. Yeah. Yes.
Q. And that if you chose not to testify the Judge would instruct the jury that you have -- they could not hold that against you; is that correct?
A. Yes.
Q. As well I have explained to you that you have the absolute right to testify and that you could if you want to --
A. Right.
Q. -- is that correct?
A. Yes.
Q. Is your decision today not to testify?

A.  I don't know at the moment.

Upon hearing the defendant's voice, the victim began crying in the courtroom, drawing the attention of the prosecutor and the court.  Nonetheless, the defense proceeded with the presentation of its proof, and the State presented rebuttal testimony from an expert. Thereafter, the trial court conducted a jury-out hearing at the State's request, at which the State informed the court that the victim had heard the defendant speaking in court earlier that day and told the prosecution team that "she is 100 percent certain she can identify his voice."  The State requested to call the victim for that purpose.

The defendant objected, asserting that the victim's claim to recognize the defendant's voice was unreliable because when the victim gave a statement at the hospital right after the rape, she said that the rapist might have been trying to disguise his voice as deeper than it really was.  The defendant also asserted that the victim's testimony was far more prejudicial than probative.  The trial court overruled the objection.  The defendant then claimed that the victim's testimony was not admissible as rebuttal proof because the defense proof had nothing to do with the defendant's voice.  The State responded that it was appropriate rebuttal proof because the defense proof focused on combatting identification.  The court ruled that it would allow the victim to testify.  The defendant then clarified for the record that he objected to the victim's testimony on grounds that the victim heard his voice at the mandatory hearing where he was required to voluntarily waive his right to testify so he was, in effect, being penalized for invoking his right to silence in that his words were being used against him.

The victim then testified that she was in the courtroom for the remainder of trial and was present during a jury-out hearing when the defendant spoke aloud for the first time. She said that when she heard the defendant's voice, "[t]hat day just flooded back to me" and her brain replayed the defendant telling her that she "should be thanking God for sparing [her] while he was raping [her]."  She stated that she might not have been able to see her rapist's face, but his voice had replayed nonstop in her head for five years.  When she heard the defendant's voice, it "brought everything back" and she could only stay in the courtroom for a few minutes before having to leave to compose herself.  Based on his voice, the victim identified the defendant as the man who raped her.  The victim stated that she had not heard the defendant speak at any other hearings or at any other point during the trial.

On cross-examination, the victim acknowledged that she told law enforcement in the immediate aftermath of the incident that the rapist had attempted to disguise his voice by making it deeper.  The victim agreed that the defendant was not attempting to disguise his voice when he spoke in court, but she clarified that the rapist had dropped his attempt

to disguise his voice by the time they were under the carport and he told her to be thankful God was sparing her.

On appeal, the defendant argues that using his *Momon* testimony against him resulted in a fundamentally unfair trial because it penalized the assertion of his right not to testify and forced a dilemma between the right to confront witnesses and the right not to self-incriminate. Alternatively, the defendant asserts that the identification was an unnecessarily suggestive and unreliable identification brought about by state action.

We determine that the defendant is not entitled to relief because he cannot show the breach of a clear and unequivocal rule of law. As the defendant appears to recognize, there is no clear and unequivocal rule of law prohibiting a witness from identifying a defendant based on hearing the defendant testify at a *Momon* hearing. In addition, there are no Tennessee cases directly addressing the administration of first-time, in-court identifications. *See Merrilees v. State*, No. M2021-01324-CCA-R3-PC, 2023 WL 3309562, at *14 (Tenn. Crim. App. May 8, 2023), *perm. app. denied* (Tenn. Nov. 16, 2023). Because this issue is a matter of first impression, there is no breach of a clear and unequivocal rule of law. *See State v. Fusco*, 404 S.W.3d 504, 532, 535-36 (Tenn. Crim. App. 2012) (declining to find a breach of a clear and unequivocal rule of law on an issue of first impression); *State v. Cody, III*, No. E2022-00947-CCA-R3-CD, 2023 WL 9006670, at *20 (Tenn. Crim. App. Dec. 28, 2023) (stating that a novel argument cannot be the basis for granting plain error relief).

As to the defendant's secondary assertion on this issue, we determine that consideration of the issue is not necessary to do substantial justice. The victim's identification was not the result of an unduly suggestive identification procedure because it occurred in court and did not involve state action. *See Merrilees*, 2023 WL 3309562, at *15 (stating that the victim's first-time, in-court, identification did not involve state action); *cf. State v. Cannon*, 642 S.W.3d 401, 448 (Tenn. Crim. App. 2021) (affirming denial of motion to suppress in-court identification based on absence of state action where the witness identified the defendant from television after previously being unable to make an identification in two photograph arrays).

Moreover, even if the identification involved state action, the victim's identification was reliable because she had an opportunity to hear the perpetrator's voice at the time of the crime, she was paying remarkable attention to details during the incident, the victim's identification was consistent with her testimony that she never saw the perpetrator's face and would be unable to identify him by sight, and the victim was certain of her identification. *See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). In addition, when making her identification, the victim did not call attention to the fact the defendant elected not to testify, and the defendant was able to cross-examine the victim concerning how she

was able to identify the defendant despite having told law enforcement in the immediate aftermath that the perpetrator had attempted to disguise his voice. Furthermore, the defendant argued to the jury in closing that the victim's identification was unreliable and made under suggestive circumstances and that the victim only identified him because he was the person on trial. The defendant is not entitled to plain error relief on this issue.

## IV. Prosecution Comment on the Defendant's Silence

During closing argument, defense counsel argued that the State could have conducted a reliable voice lineup in the years leading up to trial. Thereafter, in its rebuttal closing argument, the prosecutor stated:

> Now, something big I also want to talk about that [defense counsel] just kept repeating was about producing a reliable voice identification. Well, the defendant has a very big right, the right to remain silent, the right not for the State to make him talk. So for [defense counsel] to say the State isn't doing their job, that's a mischaracterization.

After the completion of the State's rebuttal closing argument, defense counsel addressed the court with his objections to the argument, per the court's directive, rather than contemporaneously objecting. One such objection was to the prosecutor's mention of the defendant's right to remain silent. While the court did not find anything improper in the State's argument, the court reiterated to the jury that the defendant had the right to remain silent.

On appeal, the defendant argues that the prosecution improperly commented on his silence by arguing that the defendant's rights prevented a non-suggestive and reliable voice identification.

The Tennessee Supreme Court has adopted a two-part test to determine whether a prosecutor's remark amounts to an improper comment on the defendant's exercise of the constitutional right to remain silent. The test analyzes: (1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's decision not to testify. *State v. Jackson*, 444 S.W.3d 554, 588 (Tenn. 2014). If application of the two-part test indicates that the prosecutor's remark was constitutionally impermissible, then the State must show that the error was harmless beyond a reasonable doubt in order avoid reversal. *Id.* at 591. When determining whether the State has met its burden, this Court "should consider the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt." *Id.* (footnote omitted).

- 12 -

As to this issue, we determine that consideration of the issue is not necessary to do substantial justice because even assuming the prosecutor's statement was improper, the error was harmless. The prosecutor's statement consisted of three sentences toward the middle of a rebuttal argument that spanned eleven pages of transcript. There is nothing in the record to indicate that the prosecutor's delivery was verbally or physically forceful such to imbue it with a greater potential for prejudice. The evidence against the defendant was reasonably strong, consisting of DNA evidence and vocal identification by the victim. Although the trial court did not give a specific curative instruction, which in our view could have actually drawn more attention to the prosecutor's statement, the court did reiterate to the jury that "the defendant has the right to remain silent" and also that "[l]awyers['] arguments are not evidence." In addition, the trial court's final charge to the jury included the following instruction on the defendant's not testifying:

> The defendant has not taken the stand to testify as a witness but you shall place no significance on this fact. The defendant is presumed innocent and the burden is on the State to prove his guilt beyond a reasonable doubt. He is not required to take the stand in his own behalf and his election not to do so cannot be considered for any purpose against him, nor can any inference be drawn from such fact.

The defendant is not entitled to plain error relief on this issue.

## V.  Improper Arguments by the State

The defendant argues that improper arguments by the State throughout the trial affected the verdict. The defendant points to remarks during opening statement, questioning of witnesses, and closing argument in which he claims the State misstated the evidence, injected issues broader than guilt or innocence into the trial, expressed personal beliefs, and argued facts outside the record.

This Court has recognized five general categories of prosecutorial misconduct: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the defendant; or (5) arguing or referring to facts outside the record that are not matters of common knowledge. *See State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

The established test for determining whether prosecutorial error based on improper comments amounts to reversible error is whether the conduct was so improper, or the

argument so inflammatory, that it affected the verdict. *See State v. Reid*, 164 S.W.3d 286, 344 (Tenn. 2005); *Goltz*, 111 S.W.3d at 5. In assessing whether comments made by the prosecution are so inflammatory or improper as to affect the verdict, the court must consider five factors:

> (1) The conduct complained of viewed in the context and the light of the facts and circumstances of the case;
> (2) The curative measures undertaken by the court and the prosecution;
> (3) The intent of the prosecutor in making the improper statements;
> (4) The cumulative effect of the improper alleged conduct and any other errors in the record; and
> (5) The relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see also Goltz*, 111 S.W.3d at 5-6.

The misstatements of the evidence that the defendant alleges center around various points of the experts' testimony concerning the DNA evidence. We observe that the expert testimony in the case was highly technical and likely difficult for a non-scientist attorney to recall and relay the intricacies of in an argument to the jury. The defendant has not shown that the prosecutor intentionally misstated the evidence, and we conclude there is no breach of a clear and unequivocal rule of law.

The defendant's allegations of injection of issues broader than guilt or innocence and, similarly, expression of personal beliefs concern the prosecutor's use of the phrases "we know" and "we agree," the prosecutor's asking the jury to not make the victim wait for justice, and the prosecutor's "wishing" that more evidence had been tested and that the victim had heard the defendant's voice before trial to identify him. We have reviewed each of the statements outlined by the defendant and, read in context, do not take the statements to be the prosecutor's expression of personal beliefs or the injection of issues broader than guilt or innocence. As such, there is no breach of a clear and unequivocal rule of law.

As to his arguing facts outside the record claim, the defendant points to the prosecutor's use of a "derogatory tone" in commenting on the length of the body camera footage and referring to the defense expert as an "armchair Googler," as well as the prosecutor's questioning an expert witness about whether a medical condition or spermicide could affect the amount of sperm found on a condom. The defendant's complaint about the prosecutor's comment on the length of the body camera footage is not a complaint about arguing facts outside the record. Likewise, the defendant's complaint about the prosecutor's reference to the defense expert as an "armchair Googler" is not a complaint about arguing facts outside the record especially when the defense expert agreed

- 14 -

that she conducted her research using a search engine similar to Google and that she did not test DNA as part of her current job. The defendant's complaint that the prosecutor questioned an expert witness about whether a medical condition or spermicide could affect the amount of sperm found on a condom is a complaint about the testimony elicited at trial, not a complaint about an improper prosecutorial argument. Having determined that none of these complaints are arguing facts outside the record, we conclude there is no breach of a clear and unequivocal rule of law.

In addition to our analysis above, we have reviewed each of the statements outlined by the defendant, in context, and we do not perceive any as being so inflammatory or improper that they affected the outcome of the trial. The defendant is not entitled to plain error relief.

## VI. Full and Complete Jury Charge

On the final day of trial, the defendant filed a motion for special jury instructions. The defendant asked the court to give an instruction on his "defense theory" as follows:

> The defense contends the State improperly collected and thereby contaminated the condom on which the defendant's DNA was found. If, after considering all of the proof, you have a reasonable doubt as to whether the defendant's DNA was on the condom before the condom was collected by the State, you must find the defendant not guilty.

The trial court declined to give the requested instruction, finding that it was too much of a comment on the evidence.

The defendant also asked the court to give the following instruction on DNA evidence:

> DNA evidence has been presented in this case. You may consider this evidence in determining the defendant's identity as the person who committed these crimes.

> DNA evidence is circumstantial evidence; that is, it is proof of collateral facts and circumstances from which the existence of a primary fact may be deduced by you according to reason and common experience. For DNA evidence alone to sustain a conviction, you must find that the defendant's DNA could only have been impressed on the condom during the commission of the crime. You may consider whether the defendant's DNA could have been transferred to the condom.

The weight to be accorded DNA evidence is a question for the jury to decide in light of all the surrounding facts and circumstances of the case.

The trial court also declined to give the requested DNA instruction, finding it was not appropriate.

The defendant also asked the trial court to give the following instruction regarding Ja'Don Boyd's prior conviction: "You may find from the evidence presented that witness [Ja'Don] Boyd has been convicted of a prior crime. If you so find, you can consider such for the purpose of its effect, if any, on his credibility as a witness." The trial court declined to give this instruction, determining that the pattern instruction on credibility of witnesses was sufficient.

The defendant also asked the trial court to instruct the jury that it was "free to find that the [victim's] identification was suggestive and therefore unreliable." The State objected, arguing that such an instruction would amount to the court commenting on the victim's credibility which was an issue for the jury. The court declined to give the requested instruction.

The defendant lastly requested a *Ferguson* instruction regarding the State's duty to preserve evidence of exculpatory value. The trial court denied the defendant's request, determining that the instruction was not applicable because, although the police officer who collected the evidence could "have done his job better," the evidence was inculpatory not exculpatory.

On appeal, the defendant argues that the trial court failed to give a full and complete charge of the law by not instructing the jury on election of offenses, or giving his requested instructions on Ja'Don Boyd's prior conviction, DNA evidence, his theory of defense, and identification.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (first citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); and then citing *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have a duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)).

We determine that the defendant is not entitled to plain error relief. As to the defendant's claim that the trial court failed to charge the jury with election of offenses, the record shows that the trial court told the jury during its final instructions that the State had to elect which of the alleged sex acts it was relying on for the charge of aggravated rape, and the State announced that it elected the act of vaginal penetration as the basis for the charge. Later in its instructions, the trial court charged the jury regarding the requirement of a unanimous verdict and what that entailed. Accordingly, there is no breach of a clear and unequivocal rule of law.

As to the trial court's not giving a special instruction on Ja'Don Boyd's prior conviction, we determine that consideration of the issue is not necessary to do substantial justice. The trial court charged the jury concerning credibility of witnesses, which included that it could consider any proof presented on a witness's reputation for telling the truth as a factor in forming an opinion on whether to believe a witness. The defendant has not shown why this instruction did not provide sufficient guidance.

As to the trial court's failure to give the defendant's proposed instruction on DNA evidence, we determine that consideration of the issue is not necessary to do substantial justice. The trial court charged the jury that it had the duty to decide the weight to give the direct and circumstantial evidence, and that it was to consider all the evidence and give it whatever weight it believed the evidence deserved. The defendant has not shown why the instructions given by the court did not provide sufficient guidance on how the jury should consider DNA evidence.

As to the trial court's failure to give the defendant's proposed instruction on his theory of defense, we determine there is no breach of a clear and unequivocal rule of law. The defendant proposed to instruct the jurors that "[i]f . . . you have a reasonable doubt as to whether the defendant's DNA was on the condom before the condom was collected by the State, you must find the defendant not guilty." Such an instruction would have essentially told the jurors to disregard the victim's identification of the defendant based on his voice and thus supplanted the jury's role as the finder of fact.

With regard to the trial court's failure to give an enhanced identification instruction, as we will explain, we determine that consideration of the issue is not necessary to do substantial justice. In *State v. Dyle*, 899 S.W.2d 607 (Tenn. 1995), the Tennessee Supreme Court promulgated a comprehensive jury instruction to be used in cases where identity is a material issue. *Id.* at 612. The instruction sets forth a list of factors for the jury to consider in determining whether the State has met its burden of proving "identification of the defendant as the person who committed the crime." *Id.* Those factors include:

- 17 -

(1) The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;

(2) The degree of certainly expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;

(3) The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and

(4) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

*Id.*

This instruction, which is now part of the Tennessee Pattern Jury Instructions, must be given whenever identification is a material issue, and the instruction is requested by the defendant's counsel. *Id.* Identity is a material issue "when the defendant puts it in issue or the eyewitness testimony is uncorroborated by circumstantial evidence." *Id.* at 612 n.4. It is plain error for the trial court not to give the comprehensive identity jury instruction under these circumstances. *Id.* at 612. "If identification is a material issue and the defendant does not request the instruction, failure to give it will be reviewable under Rule 52 harmless error standard." *Id.*

In this case, the defendant did not ask the trial court to give the enhanced identification instruction. The defendant did ask the court to declare a mistrial based on the victim's identification or, in the alternative, for "a jury instruction that says the jury is free to find that the identification was suggestive and therefore unreliable." However, it would be a stretch to view that request as a request for an enhanced identification instruction. Because the defendant did not request the instruction, the trial court's failure to give it is reviewable under the harmless error standard, which is now found in Tennessee Rule of Appellate Procedure 36(b). Under harmless error analysis, "[r]eversal is [only] required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice." *State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998).

We conclude that this error was harmless and that consideration of the error as plain is, therefore, not necessary to do substantial justice. A review of the factors outlined in *Dyle* support the reliability of the victim's identification. The victim had ample

- 18 -

opportunity to observe the perpetrator for a significant period of time and at a close distance. The victim's identification was the product of her own recollection, and she immediately identified the defendant as the perpetrator upon hearing his voice. Nothing in the victim's testimony about the identification indicates any uncertainty. The victim did not have a prior occasion to identify the defendant before trial such that there is a prior identification to consider. Although the trial court failed to provide the enhanced identification instruction, the court did provide the jury with instructions on evaluating the credibility of witnesses. Moreover, in our view, evidence that the victim's and the defendant's DNA was found on the condom was particularly convincing evidence of identification. We cannot say that the failure to give an enhanced identification instruction more probably than not affected the judgment or resulted in prejudice to the judicial process. As such, we decline to notice this issue as plain error.

## VII. Cumulative Error

The defendant lastly argues that the cumulative errors in the case warrant reversal. The cumulative error doctrine applies when multiple errors were committed during trial, each of which alone would have constituted harmless error, but in the aggregate have a cumulative effect on the proceedings so great the defendant's right to a fair trial can only be preserved through reversal. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Circumstances warranting reversal of a conviction under the cumulative error doctrine "remain rare." *Id.* Our review is limited to plain error and the defendant has failed to establish plain error with respect to any of his issues. Accordingly, there can be no cumulative error in the absence of any error.

### *Conclusion*

Based on the forgoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE